FILED

FEB 1 8 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
             DEPUTY CLERK

1

2

3

4

5

6

7                IN THE UNITED STATES DISTRICT COURT

8             FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   PIT RIVER TRIBE; NATIVE
     COALITION FOR MEDICINE LAKE
11   HIGHLANDS; AND MOUNT SHASTA
     BIOREGIONAL ECOLOGY CENTER,              CIV-S-02-1314 DFL/JFM
12
13        Plaintiffs,
                                              MEMORANDUM OF OPINION
14        v.                                        AND ORDER

15   BUREAU OF LAND MANAGEMENT;
     UNITED STATES DEPARTMENT OF THE
16   INTERIOR; U.S. FOREST SERVICE;          CLOSED
     ADVISORY COUNCIL ON HISTORIC
17   PRESERVATION; AND CALPINE           DATE FEB 13 2004
     CORPORATION,
18
19        Defendants.

20

21

22        The Pit River Tribe, joined by two other groups, challenges

23   the decision-making process followed by the Bureau of Land

24   Management ("BLM") and the United States Forest Service in

25   connection with a geothermal lease to Calpine Corporation on BLM

26   lands near Medicine Lake, California.  Calpine proposes to build

     a geothermal power plant on the lease lands, at a location known

                              55
                                 1

as Fourmile Hill.  Plaintiffs ask the court to set aside the leases, thereby putting a stop to the proposed power plant.  They bring suit under the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA"), the Geothermal Steam Act, the National Forest Management Act ("NFMA"), and the Administrative Procedure Act ("APA").  Additionally, the Tribe alleges violations of the federal government's trust obligations.  The parties have filed cross-motions for summary judgment.

I. Facts and Procedural History

A. The Medicine Lake Highlands and the Pit River Tribe

The lead plaintiff is the Pit River Tribe ("Tribe"), a federally registered Indian tribe.  The Tribe has lived in Northern California and Southern Oregon for thousands of years.  (Pls.' Mot. for PSJ at 3.)  The Medicine Lake Highlands ("Highlands") is an area located in Klamath, Modoc, and Shasta-Trinity National Forests, though its borders are not clearly defined.  (FEIS Fig. S-1.)  The area is within the Tribe's ancestral homeland; however, the Highlands are not tribal land, and the Tribe exercises no external sovereignty over the area.  (Compl. Ex. A.)  The Highlands are considered sacred by the Tribe and contain a number of important spiritual and cultural sites that are still used by members of the Tribe.  (FEIS at 3-64.)

B. Geothermal Leases and the Fourmile Hill Project

The federal government has designated the general area of the Highlands as the Glass Mountain Known Geothermal Resource Area ("KGRA").  The Glass Mountain KGRA may be capable of

2

1  producing up to 500 megawatts of electricity.  (Calpine's Reply

2  at 20-22.)  Under authority of the Geothermal Steam Act, 30

3  U.S.C. § 1001 et seq., the BLM leased the two parcels at issue in

4  the Glass Mountain KGRA to the predecessor in interest of Calpine

5  in 1988 for an initial term of 10 years.  (FEIS at 1-12; AR

6  21274.)  Calpine was assigned the leases in 1996, although it had

7  obtained operating rights in 1994.  (FEIS at 1-12.)  The BLM

8  extended the leases for terms of five years in 1998.  (AR 21274.)

9       In 1994, Calpine drilled a temperature core hole well at the

10  location of the proposed power plant, now in dispute, known as

11  the Fourmile Hill Development Project ("Fourmile Hill").  (FEIS

12  at 1-12.)  The power plant would be built approximately three

13  miles northwest of Medicine Lake in the Klamath National Forest,

14  well within the area traditionally described as the Medicine Lake

15  Highlands.  (FEIS at 1-1.)  In 1995, Calpine proposed a plan of

16  operations that included drilling another exploration well at

17  Fourmile Hill.  (FEIS at 1-14.)  In 1996, Calpine submitted a

18  full development proposal for Fourmile Hill including a 50-

19  megawatt power plant with power transmission lines from the plant

20  to a main line 24 miles away.  (FEIS at S-21, 22.)  The clearance

21  necessary for the power lines would disturb significantly more

22  land (335 acres) than that needed for the plant itself (about 50

23  acres).  (FEIS at 2-12.)  The BLM considered several different

24  routes for the power transmission lines, settling on the one that

25  it determined would have the least adverse impact on the area.

26       In 2000, Calpine acquired CalEnergy, the other major

3

geothermal lessee in the Glass Mountain KGRA.  (Calpine's Answer ¶ 100.)  CalEnergy was the owner and operator of a lease within the Glass Mountain KGRA that contains a well capable of producing geothermal steam in commercial quantities, known as a paying well.  (Calpine's SUF ¶ 24.)  Under the BLM's Geothermal Steam Act regulations, a paying well on one lease entitles that lessee to 40-year extensions on its other leases.  Because Calpine acquired a paying well, the BLM granted a 40-year extension to Calpine for its other leases in the Glass Mountain KGRA on May 2, 2002.  (Id. ¶ 25.)

C.  Various NEPA Compliance Documents

The leasing and development process has led to the creation of a number of NEPA documents.  To begin with, in 1973, the Department of the Interior prepared a programmatic Environmental Impact Statement ("EIS") for nationwide implementation of the Geothermal Steam Act.  (AR 17071-19558.)  In 1981, when the initial decision was made to issue leases in the Glass Mountain KGRA, the BLM completed an environmental assessment ("EA"), which addressed primarily the impacts of casual use exploration, including geologic mapping, soil sampling, and aerial surveys.  (AR 19626, 19637.)  A supplemental EA ("SEA") was completed in September 1984.  The SEA addressed the exploration, development, and production phases.  (Id.)  Based on the SEA, the BLM made a Finding of No Significant Impact ("FONSI"), such that an EIS was deemed unnecessary before the initial letting of geothermal leases at the Glass Mountain KGRA.  (AR 19621.)  When Calpine

submitted its exploration plan in 1995, the BLM completed an EA
and issued a FONSI before approving the exploration plan.  (FEIS
at 1-14, 16.)   No EA or EIS was completed when the leases were
extended for five-year terms in 1998 or for 40-year terms in
2002.  After Calpine submitted its Fourmile Hill project proposal
in 1996, the federal defendants began work on an EIS.   The
agencies completed the Fourmile Hill final EIS ("FEIS") in
September 1998.

The FEIS is organized into three main sections.  The first
describes the alternatives, including the proposed action.  (FEIS
at 2-1 to 2-80.)  This section discusses the nature of the
Fourmile Hill project, including all the various components of
the power plant.  It also lays out the proposed alternative
routes for the power lines carrying electricity from the plant to
the central transmission lines.  The second significant section
of the FEIS describes the environment affected by the project.
(Id. at 3-1 to 3-216.)  It discusses the natural environment, for
example, vegetation and wildlife, as well as the human
environment, for example, recreation and transportation.  This
section includes a discussion of "traditional cultural values."
(Id. at 3-64 to 3-77.)  Finally, the FEIS has a section devoted
to the environmental consequences of the project and the
mitigation measures adopted.  (Id. at 4-1 to 4-340.)   This
section analyzes the impacts on all the various aspects of the
natural and human environment discussed in the previous section.
This section includes the FEIS' discussion of the unavoidable

significant effects of the project, including those to
traditional cultural values.  (Id. at 4-335.)

### D.  Tribal Consultations

The record is silent as to when consultation with the Pit
River Tribe or any other tribe began.  The Tribe received a copy
of the 1995 EA concerning Calpine's proposed exploration plan.
(Fed. Defs.' Opp'n at 14.)  The Tribe did not appeal the BLM's
FONSI.  (Id.)  The BLM and Forest Service consulted the Pit River
and Klamath Tribes on a number of occasions during the
preparation of the Fourmile Hill EIS.  Between October 1995 and
April 1998, the Forest Service and the BLM had six meetings with
the Pit River Tribe and eight meetings with the Klamath Tribes.
(FEIS at 3-66.)  In addition, Calpine hired an ethnographic
consultant to study the area's importance to local Indians.  The
consultant interviewed 31 local residents, mostly from the Pit
River Tribe, and also made several site visits.  (Id. at 3-66 to
3-68.)  This study was incorporated into the FEIS.

### E.  Agency Actions:  the Record of Decision, the Moratorium, and the Forest Plan Amendment

After completion of the FEIS, the BLM and Forest Service
issued a joint project Record of Decision ("ROD") approving the
Fourmile Hill project on May 31, 2000.[1]  (AR 19982-20008.)
However, the ROD contained a five-year moratorium on further

---

[1]  Shortly before the ROD was issued, the BLM, Forest
Service, State Historic Preservation Officer, and Advisory
Council on Historic Preservation completed a Memorandum of
Agreement regarding the project under the National Historic
Preservation Act.  (AR 20051-20071.)

development in the Glass Mountain KGRA, pending analysis of the
actual impacts of the development of the Fourmile Hill project.
(AR 19983.)  On June 15, 2001, the BLM decided to lift the
moratorium, citing:  (a) the serious national energy shortage,
(b) a new executive order directing agencies to expedite projects
that increase energy production, and (c) the recommendations of
the President's National Energy Policy Development Group for more
geothermal power and for the streamlining of the geothermal
leasing process.  (AR 15471-15472.)  By lifting the moratorium,
the agency allowed potential further geothermal development on
additional leases within the Glass Mountain KGRA, whether by
Calpine or another lessee.

The ROD also announced a change in the Klamath Forest Plan
Standard 24-25.  (AR 19984.)  The old Standard provided: "Protect
traditional Native American rights and practices (Public Law (PL)
95-341) to insure the integrity of the site and to assure that
the use will continue to occur and will not be impaired."  (FEIS
at 4-77.)  The new Standard states: "Protect traditional American
Indian cultural and religious uses and practices consistent with
Public Law 95-341 (American Indian Religious Freedom Act of
1978)."  (AR 19984.)

F.  Procedural History

The Tribe filed an administrative appeal of the ROD with the
Forest Service and BLM.  (AR 19559, 20086.)  Both appeals were
denied, and this action followed.  (Id.)  The plaintiffs advance
ten claims: (1) the Fourmile Hill FEIS is inadequate under NEPA;

1  (2) the project approval violates the National Historic

2  Preservation Act; (3) the 1998 lease extension violates the

3  Geothermal Steam Act; (4) the 1998 lease extension violates NEPA;

4  (5) the 1998 lease extension violates NHPA; (6) lifting the five-

5  year moratorium violates the Administrative Procedure Act; (7)

6  the Klamath Forest Plan amendment violates the National Forest

7  Management Act; (8) the failure to comply with forest plan

8  standards violates the NFMA; (9) the development of the Highlands

9  without adequate consultation with the tribes violates the

10  federal government's trust obligation to American Indians; and

11  (10) the failure to timely implement all conditions in the Record

12  of Decision is willful agency inaction in violation of the APA.

13      The parties have filed cross-motions for summary judgment on

14  all claims.

15                II.  Sufficiency of the Fourmile Hill
16                  Environmental Impact Statement

17      The plaintiffs argue that the Fourmile Hill FEIS is

18  deficient in its scope and depth of analysis and thus violates

19  NEPA.  At first blush this would seem rather unlikely.  The FEIS

20  is approximately 700 pages long.  NEPA's implementing regulations

21  state that an EIS of "unusual scope or complexity shall normally

22  be less than 300 pages," and a single 50-megawatt power plant is

23  not of "unusual scope or complexity."  40 C.F.R. § 1502.7.  An

24  entire ethnographic study was made of the area's importance to

25  local American Indians and is incorporated into the FEIS.

26  Nevertheless, plaintiffs argue that the FEIS is insufficient.

1    The central thrust of plaintiffs' argument is that the FEIS
2  does not explicitly compare the significant adverse impacts that
3  any geothermal development in the Medicine Lake Highlands will
4  have on Indian spiritual life to the relatively small amount of
5  electricity that can be produced there.  Moreover, plaintiffs
6  contend that this comparison should have been made in light of
7  other methods for producing an equivalent amount of electricity
8  in other locations.

9    Plaintiffs misconstrue the requirements of NEPA.  NEPA does
10 not require an FEIS directed to a particular project to discuss,
11 much less to set, national energy priorities.  Rather, NEPA
12 requires full disclosure of the adverse environmental impacts of
13 the proposed development, as compared with alternative ways of
14 accomplishing the same thing at the same site.  Here, the various
15 agencies did not need to consider the virtually unlimited number
16 of methods and locations for generating 50 megawatts of
17 electricity, like windmills near Yreka, a coal-fired plant
18 outside of Redding, or a new hydro-electric project on some
19 western river.  Congress has already made it national policy to
20 pursue geothermal power generation, in the limited number of
21 locations where it is feasible, through the Geothermal Steam Act.
22 The 1973 programmatic EIS that accompanied the Geothermal Steam
23 Act considered alternative sources of power; thereafter it was
24 unnecessary for every geothermal project to reinvent the wheel.
25 All of the alternative sources of electrical power that
26 plaintiffs might suggest fail to accomplish the central purpose

of the Fourmile Hill project – the development of a geothermal power plant to exploit the clean, renewable energy source that lies beneath the mountains of the Medicine Lake Highlands. Moreover, as further discussed below, the FEIS fully identifies the costs and benefits of the Fourmile Hill project.  It does not conceal the possible damage to tribal spiritual values and observance, nor does it exaggerate the potential power generation at the site.  NEPA requires no more.

The court's decision to uphold the Fourmile Hill FEIS also reflects the deferential standard of review under the Administrative Procedure Act, which governs the review of agency decisions within the NEPA framework. Selkirk Conservation Alliance v. Forsgren, 336 F.3d 944, 953 (9th Cir. 2003).  Under the APA, an agency decision may be overturned only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The Ninth Circuit applies the "rule of reason" when reviewing the adequacy of an EIS.  Selkirk Conservation Alliance, 336 F.3d at 958.  The EIS must contain a "reasonably thorough" discussion of the relevant issues.  Id.  However, the reviewing court must not "fly speck" the document.  See Churchill County v. Norton, 276 F.3d 1060, 1071 (9th Cir. 2001); Oregon Envtl. Council v. Kunzman, 817 F.2d 484, 496 (9th Cir. 1987).  The role of the court is to ensure that the agency took a "hard look" at the environmental consequences of the proposed action.  Churchill County, 276 F.3d at 1072.  It is not the role of the court to decide whether the

1   agency made the correct choice among the various possible

2   options.

3       Plaintiffs argue that the FEIS is insufficient because: (1)

4   it does not adequately discuss the impact of geothermal

5   development on Indian spiritual life; (2) it contains an overly

6   narrow statement of purpose and an overly vague statement of

7   need; (3) it fails to consider appropriate alternatives; (4) it

8   has an insufficient cumulative impacts analysis; (5) there are

9   various technical deficiencies or omissions; and (6) a

10  supplemental EIS is necessary to address several issues.  The

11  court now turns to these specific attacks on the FEIS.

12       A.  Discussion of the Impact on Indian Spiritual Life

13      The plaintiffs' central complaint about the FEIS is that it

14  fails to address head-on "the wisdom of this stark tradeoff -

15  that is, sacrifice of the Highlands' environmental integrity, Pit

16  River Tribe cultural life, and ten thousand years of spiritual

17  practice in return for a minuscule amount of electricity."

18  (Pls.' Opp'n at 2.)  They argue that there should have been an

19  explicit balancing of the harm to the spiritual significance of

20  the Highlands from the cumulative impacts of development against

21  the benefits of the geothermal power, as compared to alternative

22  ways to produce the same amount of power.  (Pls.' Opp'n at 10.)

23  However, the plaintiffs recognize that the FEIS acknowledges that

24  the project "will have significant unavoidable adverse impacts on

25  traditional Native American cultural uses and religious

26  practices," and includes an in-depth study of the cultural and

11

1  spiritual significance of the Medicine Lake Highlands.  (Pls.'

2  Opp'n at 4.)

3      Plaintiffs' complaint is either with the style and format of

4  the FEIS or with the defendants' ultimate decision to permit the

5  geothermal project despite its adverse effects.  The FEIS does

6  disclose the very impacts the plaintiffs want discussed.  For

7  example, the FEIS states that "elements of the project would be

8  visible and audible at sites in the Medicine Lake Highlands,"

9  which may lead local Indians "to not use sites in the project

10  region."  (FEIS at 4-78.)  The FEIS also clearly discloses the

11  energy capacity of the Fourmile Hill project.  (FEIS at S-1.)

12  The "stark tradeoff" the plaintiffs complain of is not

13  highlighted because the FEIS undertakes to discuss all impacts of

14  the project:  to wildlife, air quality, recreation, and others.

15  However, as long as the impacts are fully discussed, as they are

16  here, the FEIS cannot be legally deficient for not emphasizing

17  particular effects and then performing a separate cost-benefit

18  analysis effect by effect.   The EIS must ensure that the reader

19  will "understand the very serious arguments advanced by the

20  plaintiff if he carefully reviews the entire environmental impact

21  statement."  Metcalf v. Daley, 214 F.3d 1135, 1142 (9th Cir.

22  2000).  The Fourmile Hill FEIS adequately discloses the negative

23  effect of development on Indian spirituality in return for 50

24  megawatts of electrical power generation.  In plaintiffs' view,

25  this trade-off cannot justify the decision to approve the

26  project.  But that is not a procedural deficiency under the APA

1   and NEPA; rather, it is a disagreement on policy outside the

2   scope of appropriate judicial review.

3       B.   Overly Narrow Statement of Purpose and Overly Vague
            Statement of Need
4

5       The FEIS states that the project's purpose is "to develop

6   the geothermal resource on Calpine's Federal Geothermal Leases"

7   and further states that the need was previously demonstrated by a

8   number of federal energy laws, including the Geothermal Steam

9   Act.  The FEIS also emphasizes the need for alternative energy

10  sources.  (FEIS at 1-3.)  The plaintiffs argue that the purpose

11  is stated too narrowly and specifically, while the need is stated

12  too vaguely.[2]  According to the plaintiffs, the purpose should

13  have been phrased narrowly but generically – to produce

14  approximately 50 megawatts of electricity.  Plaintiffs argue that

15  by narrowly defining the purpose as development of geothermal

16  resources on Calpine leases, the agencies "have essentially

17  preordained the outcome of the evaluation" because no other

18  alternative would satisfy that purpose.  (Pls.' Opp'n at 9-13.)

19      The "purpose and need" section of an EIS is important

20

21      [2]   Plaintiffs criticize the statement of need in the FEIS as
    overly vague.  The FEIS relies upon other statutes and
22  directives, such as the Geothermal Steam Act, which suggest a
    policy in favor of geothermal power development.  Plaintiffs
23  argue that none of the documents cited expresses any need for
    development in the Glass Mountain KGRA specifically.  But
24  plaintiffs never suggest a more appropriate formulation of the
    statement of need.  According to the plaintiffs, a proposed power
25  development must do more than just identify a purported need for
    energy.  (Pls.' Opp'n at 13.)  The formulation in the FEIS is
26  more specific than this by citing a need for geothermal
    development specifically.

1  because it defines the scope of the alternatives analysis.

2  Friends of Southeast's Future v. Morrison, 153 F.3d 1059, 1066

3  (9th Cir. 1998).  Thus, when the purpose and need are stated

4  narrowly, few alternatives need be discussed because few

5  alternatives will achieve the same specific purpose and meet the

6  same need.  The rule of reason applies to this section of the

7  EIS, such that the statement of purpose cannot be unreasonably

8  narrow.  Id. at 1067.  The Ninth Circuit has not held an EIS

9  deficient because of an improper statement of purpose or need and

10  has approved a number of site-specific, narrow statements.  See

11  id. (purpose was to "meet market demand for timber in Southeast

12  Alaska"); City of Carmel-by-the-Sea v. U.S. Dep't of Transp., 123

13  F.3d 1142, 1155-57 (9th Cir. 1997) (purpose was to achieve a

14  particular flow of traffic on a stretch of highway).  For

15  example, in City of Angoon v. Hodel, 803 F.2d 1016, 1021 (9th

16  Cir. 1986), the Ninth Circuit reversed the district court and

17  found that the EIS' stated purpose of providing a "safe,

18  effective means of transferring timber" from a particular tract

19  of land to market was not improperly narrow and rejected the

20  contention that the purpose should have been stated more broadly

21  as "commercial timber harvesting."  Id. at 1021.  The court held

22  that a site- specific proposal need not have a "broad social

23  interest" purpose and need.  Id.

24      The stated purpose and need in the Fourmile Hill FEIS is

25  appropriate for a site-specific EIS.  It is not unreasonable for

26  the FEIS to focus narrowly on this particular project and to

state its purpose in terms of the geothermal leases held by
Calpine.  Earlier NEPA documents have considered the broader
actions.  The programmatic EIS considered whether any geothermal
development was advisable.  The 1984 SEA considered whether to
begin geothermal leasing at the Glass Mountain KGRA.  In light of
these two more general documents, it is entirely appropriate for
the Fourmile Hill FEIS to state its purpose narrowly.

       C.  Consideration of Appropriate Alternatives

       The alternatives analysis is the "heart" of the EIS.  40
C.F.R. § 1502.14; Friends of Southeast's Future, 153 F.3d at
1065.  The range of alternatives is dictated by "the stated goal
of a project."  Muckleshoot Indian Tribe v. U.S. Forest Serv.,
177 F.3d 800, 812 (9th Cir. 1999).  As with the rest of the EIS,
the "rule of reason" applies to the agencies' choice of
alternatives.  City of Angoon, 803 F.2d at 1020.  Plaintiffs
argue that the FEIS fails to consider enough appropriate
alternatives.  (Pls.' Opp'n at 13-16.)  The FEIS considers a no-
action alternative and six alternatives that differ only in the
placement of the project's power lines.  The plaintiffs argue
that the FEIS is inadequate because it fails to consider other
energy technology like solar energy or "amending the Klamath and
Modoc Forest Plans to protect the area from development."  (Pls.'
Opp'n  at 15.)

       The alternatives considered in the Fourmile FEIS are narrow.
However, they are tailored to the statement of purpose and need,
and "it makes no sense to consider the alternative ways by which

1  another thing might be achieved."  <u>Friends of Southeast's Future</u>,

2  153 F.3d at 1067.  This is especially true when the sorts of

3  alternatives suggested by plaintiffs, other sources of power and

4  complete protection of the site, are the functional equivalent of

5  the no-action alternative.  The sorts of alternatives suggested

6  by the plaintiffs are more appropriate to earlier NEPA documents,

7  and, indeed, the programmatic EIS for the Geothermal Steam Act

8  did consider alternative sources of electricity including coal,

9  oil, natural gas, nuclear, hydroelectric, and solar.  (AR 17430-

10  17581.)  The discussion of these alternatives is thorough, if not

11  exhaustive, stretching some 150 densely worded pages.  The

12  different alternative sources of energy are discussed in turn,

13  each with its own advantages and disadvantages, merits and

14  demerits.  The discussion includes not just the direct

15  environmental impacts of power generation, but also the impacts

16  of extraction and transportation of the fuel where that is

17  relevant, such as for coal, oil, and nuclear power.  In light of

18  this extensive discussion of alternatives, the BLM decided to

19  issue regulations to put the Geothermal Steam Act into effect.

20  Thus, as a result of earlier environmental analyses, the BLM

21  already had settled on developing geothermal power, where

22  possible, despite the various other ways that the nation can meet

23  its electricity needs.  The only task for the FEIS is to identify

24  the effects of developing geothermal power at the Fourmile Hill

25  site.

26      At a more specific level, plaintiffs downplay the importance

of the FEIS' consideration of several alternative routes for the electrical transmission lines leading from the plant.   These transmission lines would have to travel the 24 miles from the plant to the main Bonneville Power Authority transmission line. Construction of the power plant itself would disturb only 50 acres of wilderness, but constructing the transmission lines would require disturbing over six times that amount – 335 acres. (FEIS at 2-12.)   The FEIS considers six different routes for the transmission lines, a serious exploration of the different alternatives.   (FEIS at 2-60.)

Additionally, the Ninth Circuit has held that the plaintiff bears the burden of coming forward with a "specific, detailed counterproposal" and must do so as early as possible in the NEPA process.   Morongo Band of Mission Indians v. FAA, 161 F.3d 569, 576 (9th Cir. 1998).   The plaintiffs have failed to offer any alternative proposals other than vague references to alternative power sources and the no-action alternative restated differently. The FEIS adequately discusses the alternatives that are appropriate in light of the project's purpose and need.

D.   Cumulative Effects Analysis

An EIS must analyze the cumulative impacts from reasonably foreseeable future actions.   40 C.F.R. § 1508.7.   Plaintiffs contend that the Fourmile Hill FEIS fails to adequately analyze the cumulative effects of future geothermal projects in the Glass Mountain KGRA because it considers only one other proposed geothermal project, a proposed power plant known as Telephone

Flat.   They argue that there is a likelihood of continued geothermal development in the area, leading to additional plants beyond the proposed Fourmile Hill and Telephone Flat plants.[3] (Pls.' Opp'n at 17.)

The BLM concluded that the impacts from further geothermal development beyond the two proposed projects were too speculative to be considered in the FEIS.   The BLM found that additional development in the Glass Mountain KGRA would "depend on the success of the currently proposed projects and the market for power."   (FEIS at 4-333.)   In other words, the economic feasibility of geothermal power generation is currently unknown, and Fourmile Hill and Telephone Flat are test cases.   If they are unsuccessful, then the BLM concluded that there would be no more geothermal development in the area.   (Id.)   Even if these projects prove successful, there is no way for the BLM to know precisely where additional commercially viable geothermal resources could be found because the necessary exploration has not yet occurred.

---

[3]   The plaintiffs' only specific objection to the inadequate cumulative impacts analysis, however, is that the "vast landscape-level impacts from such build-out [ten or more power plants] would be devastating to the Tribes' spiritual interests in and cultural uses of Medicine Lake and the surrounding Highlands."   (Pls.' Opp'n at 19.)   But the FEIS' discussion of cumulative impacts indicates that the activities considered would "result in cumulatively significant visual impacts" and "in cumulatively significant impacts on traditional cultural uses." (FEIS at 4-317, 321.)   These impacts are not quantifiable. Therefore, even had other future projects been factored in, the conclusion would have been the same – that the development would "result in cumulatively significant impacts" on traditional cultural uses and the natural visual aesthetic.

1    Given these uncertainties, the BLM concluded that it is "too

2  speculative to attempt to estimate the expected environmental

3  effects of future geothermal development projects." (Id.) The

4  Telephone Plant proposal is the only project that the record

5  suggests is being actively considered by the BLM or by any of the

6  geothermal lessees.  The plaintiffs cite a number of pieces of

7  evidence which indicate that the parties are contemplating the

8  possibility of future development. (Pls.' Mot. at 17-18.)  But

9  none of that evidence indicates that there are any projects

10  beyond the talking stage or that further development would be

11  commercially or practically viable.  Because of all of the

12  obstacles to future development, and the general uncertainty

13  surrounding it, the BLM's determination that Telephone Flat is

14  the only reasonably foreseeable future development is reasonable.

15      E.  Various Alleged Technical Deficiencies and Omissions

16    Plaintiffs advance a number of objections to the FEIS that

17  can be grouped under this heading.  The objections all amount to

18  impermissible fly-specking of a complex, lengthy FEIS.  See

19  Friends of Southeast's Future, 153 F.3d at 1063 (holding that

20  court must not "fly-speck the document and hold it insufficient

21  on the basis of inconsequential, technical deficiencies")

22  (internal quotation omitted).

23      1.  Socioeconomic Impacts on Native Americans

24    The plaintiffs argue that "[t]he continuing erosion of

25  Native peoples' spiritual connection to the land – and the loss

26  of traditional religious sites for spiritual renewal – may well

increase or exacerbate social ills, such as substance abuse [and]

mental illness." (Pls.' Opp'n at 20.)  The only support offered

for this assertion is a declaration by a member of the Tribe.

(Preston Decl. ¶¶ 7-8.)  He offers no expert qualifications for

his opinion, nor does he cite any statistical study of Indian

substance abuse or mental illness that finds a reliable causal

connection to the loss of traditional religious sites.  The FEIS

discusses at length the impact of the project on the Tribe's

cultural and spiritual use of the land.  (FEIS at 4-59 to 4-81.)

It recognizes that the project would "disproportionately affect

the local American Indians because it could affect tribal use and

spiritual values."  (FEIS at 4-296.)  The FEIS' rather

comprehensive discussion of the impacts on local Indians is

adequate.

### 2.  Nitrogen Emissions

Plaintiffs argue that the FEIS is based on flawed estimates

of nitrogen oxide emissions.  Plaintiffs' argument reveals inter-

agency disagreement between the Siskiyou County Air Pollution

Control District, the California Air Resources Board, and the

EPA.  (Pls.' Opp'n at 22-24.)  However, NEPA does not require a

court "to resolve disagreements among various scientists."

Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1359

(9th Cir. 1993).  "An agency must have discretion to rely on the

reasonable opinions of its own qualified experts even if . . . a

court might find contrary views more persuasive."  Id. (omission

in original) (quoting Marsh v. Or. Natural Res. Council, 490 U.S.

360, 378, 109 S. Ct. 1851 (1989).  The FEIS apparently relies on

the data and opinion of the Siskiyou County Air Pollution Control

District.  Where there are divergent views among various experts,

as here, the BLM is entitled to rely on the analysis and

conclusions of a local agency with expertise and experience in

the field like the Siskiyou County Air Pollution Control

District.

### 3.  Hydrogen Sulfide Emissions

The plaintiffs also argue that the FEIS' discussion of

hydrogen sulfide emissions is inadequate.  (Pls.' Opp'n at 24-

25.)  There were differing expert estimates of hydrogen sulfide

emissions from a completed power plant at Fourmile Hill:  one at

about 7 tons per year during operation, one at roughly 18 tons

per year.  (FEIS at 4-230; AR 15391)  This is a serious

difference.  But even the plaintiffs attribute this to "a lack of

information about the chemical properties of the geothermal

resource."  (Pls.' Opp'n at 25.)  The FEIS is based on the

expectation that concentrations of hydrogen sulfide will be low.

(FEIS at 4-324.)  In addition, many mitigation measures are

required, and the emission is governed by the Clean Air Act.  The

FEIS contains substantial discussions of hydrogen sulfide

emissions.  The FEIS' reliance on expert predictions and

mitigation by technological controls is not unreasonable.

### 4.  Water Quality Analysis

Plaintiffs' argument that the FEIS' water quality analysis

is flawed comes down to two statements in the FEIS that

1  plaintiffs find contradictory.  Plaintiffs point to one statement

2  asserting that the geothermal reservoir is replenished from deep

3  sources and to another asserting that recharge occurs from

4  surface waters.[4]  (Pls.' Opp'n at 26.)  The document as a whole

5  seems to be based on the assumption that there is an impenetrable

6  layer between the surface/shallow ground water and the deeper

7  geothermal reservoir.  (See FEIS at 3-42 to 3-50.)  The

8  plaintiffs identify one sentence in a 700-page document that

9  could possibly be interpreted as suggesting that "some" of the

10  lost geothermal fluids "may" be replaced from groundwater

11  sources.  (FEIS at 4-44.)  No reliance appears to be placed on

12  this tentative statement.  This is fly-specking; the FEIS'

13  discussion of water quality and hydrology is not unreasonable.

14      F.  Failure to Prepare a Supplemental EIS

15      Plaintiffs argue that a number of flaws were found in the

16  FEIS and that the corrections were not circulated to the public.

17  (Pls.' Opp'n at 28-33.)  They also argue that an SEIS should have

18  been prepared to incorporate these corrections.  The corrections

19  relate to National Register eligibility, noise and visual

20  impacts, and seismic activity.

21

22  _____

23      [4]  The FEIS states that "[i]t is possible that some natural
    recharge to the geothermal reservoir occurs via the caldera ring
24  fractures system."  (FEIS at 4-44.)  This seems to indicate
    recharge from shallow groundwater or surface water.  Earlier in
25  the document, the FEIS states that "[s]hallow groundwater within
    the caldera is probably separated from the shallow groundwater
26  outside the caldera by shallow impermeability within the ring
    fracture system . . . .. The geothermal system may be recharged
    from deep groundwater."  (FEIS at 3-50.)

1    An agency must supplement an EIS when "[t]here are

2 significant new circumstances or information relevant to

3 environmental concerns and bearing on the proposed action or its

4 impacts."  40 C.F.R. § 1502.9(c)(1)(ii).  In these circumstances,

5 an agency cannot "rest on the original document" but must

6 continue to take a "hard look at the environmental effects of its

7 action."  Friends of the Clearwater v. Dombeck, 222 F.3d 552, 557

8 (9th Cir. 2000).  None of the three items cited by the plaintiffs

9 is significant enough to require an SEIS.  In 1999, after the

10 FEIS was completed, the Medicine Lake Highlands were determined

11 to be eligible for listing on the National Register of Historic

12 Places.  However, the FEIS discusses at length the cultural and

13 archeological resources in the area; eligibility of the area for

14 listing on the National Register does not change these underlying

15 facts.  (FEIS at 3-52 to 3-63.)  Moreover, that the agencies and

16 Calpine conducted supplemental noise and visual impact studies

17 after the Register eligibility was announced shows that they

18 continued to take a hard look at the environmental consequences.

19 It would be perverse to create a disincentive to further

20 analysis.

21    The finding of one additional fault-line and a potential

22 increase in the likelihood of seismic activity also does not

23 warrant a supplemental EIS.  The FEIS discusses the risks of

24 seismic activity and states that there is a risk of damage to

25 wells and pumps and damage to the transmission lines.  The FEIS

26 concludes that the risks are low because the historic seismic

1  activity in the area has been low.  (FEIS at 4-8.)  The discovery

2  of an additional fault-line does not alter these risks – none of

3  which are very threatening – so significantly as to warrant an

4  SEIS.  The agencies' decision not to prepare an SEIS will be

5  overturned only if arbitrary and capricious.  Envtl. Coalition of

6  Ojai v. Brown, 72 F.3d 1411, 1418 (9th Cir. 1995).  None of the

7  facts cited by the plaintiffs show the agencies' decision to be

8  arbitrary and capricious.[5]

9      G.  Conclusion

10     An EIS need only be sufficient to foster "both informed

11  decision making and informed public participation."  Ass'n of

12  Pub. Agency Customers v. Bonneville Power Admin., 126 F.3d 1158,

13  1183 (9th Cir. 1997) (internal quotations omitted).  The 700-page

14  Fourmile Hill FEIS comprehensively discusses all of the impacts

15  from the project, including a significant discussion of its

16  impact on the local Indians.  None of the omissions or

17  deficiencies raised by the plaintiffs is unreasonable.  NEPA

18  requires only informed agency decision making, not any particular

19  outcome.  The role of the reviewing court is not to insure that

20  the agency made the best decision possible, or even a reasonable

21  one, but simply that the environmental impact statement prepared

22  by the agency contains "a reasonably thorough discussion of the

23

24      [5]  The plaintiffs also separately argue that the FEIS is
    deficient because the seismic data were not circulated for public
25  comment and review.  They cite no cases for this proposition.  If
    the data do not necessitate an SEIS, then they cannot invalidate
26  the FEIS.  To hold otherwise would be inconsistent with the
    regulations and cases that govern when an SEIS is necessary.

1 significant aspects of the probable environmental consequences."

2 Churchill County, 276 F.3d at 1071.

3 The Fourmile Hill FEIS includes a more than reasonably thorough

4 discussion of the probable environmental consequences of the

5 proposed development at Fourmile Hill.

6              III.  National Historic Preservation Act Challenge to
                            the Project Approval
7

8         Plaintiffs contend that the federal agencies violated the

9 National Historic Preservation Act by not properly identifying

10 historic properties on the Fourmile Hill site.   The National

11 Historic Preservation Act requires the agency to take the

12 following actions prior to a federal undertaking:   "make a

13 reasonable and good faith effort to identify historic properties;

14 determine whether identified properties are eligible for listing

15 on the National Register . . .; assess the effects of the

16 undertaking on any eligible properties found; determine whether

17 the effect will be adverse; and avoid or mitigate any adverse

18 effects."   Muckleshoot Indian Tribe, 177 F.3d at 805 (citations

19 omitted).   There are few cases that analyze NHPA's requirements.

20 The leading case analyzing the good faith identification

21 requirement is Pueblo of Sandia v. United States, 50 F.3d 856,

22 859-63 (10th Cir. 1995).   In Sandia, the Forest Service's only

23 effort to identify important cultural properties was a request

24 for information from the tribes.   Id.   The court held that this

25 was not reasonable nor in good faith.   Id.   In Muckleshoot Indian

26 Tribe, the Ninth Circuit relied on Sandia to find that actions by

the Forest Service satisfied the statute.   177 F.3d at 806-07.
The Forest Service's actions in <u>Muckleshoot Indian Tribe</u> did not
include interviews and field surveys, and thus were less
extensive than those at Fourmile Hill.   <u>Id.</u>   The efforts at
Fourmile Hill went well beyond those in <u>Sandia</u> and <u>Muckleshoot</u>
and were not unreasonable or in bad faith.[6]

     Plaintiffs specifically argue that the agencies' decision
not to attempt to identify the cultural resources along every
alternative power line route was unreasonable.[7]   However, a BLM
regulation provides that "[w]here the alternatives under
consideration consist of corridors or large land areas, . . . the
agency official may use a phased process to conduct
identification and evaluation efforts."   36 C.F.R. § 800.4(b)(2).
This regulation allows postponing the process of identifying
sites until the agency chooses between the alternatives.   <u>Id.</u>
"The agency official may also defer final identification and

_____

     [6]   The plaintiffs challenge the agencies' NHPA compliance
under the APA.   The highly deferential standard of review under
the APA applies here as it does elsewhere.   <u>See</u> <u>San Carlos Apache</u>
<u>Tribe v. United States</u>, 272 F.Supp.2d 860, 886 n.16 (D. Ariz.
2003).   Plaintiffs make a separate argument that the defendants
failed to coordinate their NHPA and NEPA analyses.   The
regulations do suggest coordination of NHPA review with review
under other statutes, including NEPA.   36 C.F.R. § 800.3(b)
("should coordinate").   This is an agency directive intended to
benefit the agency by preventing duplication of effort, so that
the agency can use "information developed for other reviews" to
satisfy NHPA.   <u>Id.</u>   Plaintiffs cite no authority for the
proposition that agency review under NEPA and NHPA must be
coordinated or that the analysis must somehow reflect this
coordination.

     [7]   NHPA regulations only require "a reasonable and good
faith effort to carry out appropriate identification efforts."
36 C.F.R. § 800.4(b)(1).

evaluation of historic properties if it is specifically provided for in a memorandum of agreement." <u>Id.</u>   There is a memorandum of agreement on Fourmile Hill, signed by the BLM, the Forest Service, the State Historic Preservation Officer, and the Advisory Council on Historic Preservation,[8] which provides for additional studies on "places subject to the direct and indirect effects by the proposed Project transmission line."   (AR 20056.) In the circumstances here, the defendants have met their identification and evaluation obligations under NHPA and its implementing regulations.

IV.   Challenges to the 1998 Lease Extension

A.   The NEPA and NHPA Claims

When the leases were extended for five years in 1998, the BLM conducted no NEPA review.   Neither an EA nor an EIS was completed.   The plaintiffs argue that the lease extensions therefore violated NEPA.   (Pls.' Mot. at 22.)   Plaintiffs also argue that the defendants' failure to prepare any report on the 1998 lease extension violated NHPA. (<u>Id.</u> at 26.)   However, the completion of the Fourmile Hill FEIS moots both of these claims.[9]

---

[8]   The Pit River Tribe, and other tribes, were invited to sign the MOA but apparently declined.

[9]   Calpine also asserts a laches defense to these claims. "[L]aches must be invoked only sparingly in environmental cases." <u>Portland Audubon Soc'y v. Lujan</u>, 884 F.2d 1233, 1241 (9th Cir. 1989).   The plaintiffs only learned of the lease extensions through a Freedom of Information Act request in 1999.   Since then, they have written letters to the EPA and Forest Service and made comments during the EIS processes for both Fourmile Hill and Telephone Flat.   (Pls.' Reply in Support of PSJ at 26-27.)   A finding of laches is inappropriate in these circumstances.

1    NEPA and NHPA are procedural statutes.  <u>Apache Survival</u>

2  <u>Coalition v. United States</u>, 21 F.3d 895, 906 (9th Cir. 1994).

3  The relief available is also only procedural.  A plaintiff's

4  effort to compel agency compliance with the statutory procedures

5  is mooted when the agency later completes those very same

6  procedures because that is the only relief plaintiff to which is

7  entitled.  Thus, the completion of an EIS moots a claim that NEPA

8  was violated when an agency failed to prepare an EA or EIS.

9  <u>Aluminum Co. of Am. v. Bonneville Power Admin.</u>, 175 F.3d 1156,

10  1163 (9th Cir. 1999); <u>City of Newport Beach v. Civil Aeronautics</u>

11  <u>Bd.</u>, 665 F.2d 1280, 1284 (D.C. Cir. 1981) (filing of an EIS

12  recommending agency action rendered claim moot); <u>Blue Ocean Pres.</u>

13  <u>Soc'y v. Watkins</u>, 767 F.Supp. 1518, 1523 (D.Haw. 1991) ("[A] suit

14  to compel an EIS is rendered moot when the EIS is completed and

15  filed.").  Plantiffs contend that the lease extensions gave

16  Calpine the right to develop geothermal plants on the leases and,

17  thus, a full EIS considering the impacts of development should

18  have been completed. (Pls.' Mot. at 23-25.)  Even assuming that

19  the plaintiffs' contention is correct, their challenge to the

20  1998 lease extension under those statutes is nevertheless moot

21  because the completion of the FEIS satisfies NEPA, and the

22  completion of the FEIS and the Memorandum of Agreement satisfies

23  NHPA.[10]

24  _____

25    [10]  Even were the court to reach the merits, the plaintiffs'
     claims would fail.  Agency actions that do not change the
26  environmental status quo are not subject to NEPA.  <u>Nat'l Wildlife</u>
     <u>Fed'n v. Espy</u>, 45 F.3d 1337, 1343 (9th Cir. 1995).  Where the
     action "will result in one injury" that is simply extended in

1    B. The Geothermal Steam Act Claim

2        Under the Geothermal Steam Act regulations applicable when

3    the BLM extended Calpine's leases, a geothermal lessee must

4    include a report with its extension request showing bona fide

5    efforts to develop the geothermal resource through: (1)

6    exploration, (2) permit applications (including environmental

7    studies and other preliminary work), and (3) marketing or sales

8    activities.   These three activities are analyzed in light of

9    current economic factors.   43 C.F.R. § 3203.1-4(c)(1)(i)-(iv)

10   (1997).   Plaintiffs complain that the BLM violated the Geothermal

11   Steam Act when it extended the leases in 1998.   They argue that

12   there is nothing in the record to demonstrate the bona fide

13   efforts necessary for the lease extension, such that the BLM's

14   1998 decision was arbitrary and capricious.   (Pls.' Mot. at 29-

15   30.)

16       In requesting an extension on the Fourmile Hill leases,

17   Calpine submitted a brief statement of its activities.   These

18   activities included preparation of an EA supporting Fourmile Hill

19

20   ────────────

21   time, for example, "continued degradation of the wetlands from
     grazing," the environmental status quo is unchanged.   Nat'l

22   Wildlife Fed'n, 45 F.3d at 1344.   In this case, the lease
     extension did not change the environmental status quo because the

23   extensions gave the lessees no additional environment-disturbing
     rights.   Therefore, the BLM's extension of the leases was exempt

24   from NEPA.   The extensions were similarly exempt from NHPA.
     "Because of the operational similarity between the two statutes,

25   courts generally treat "major federal actions" under the NEPA as
     closely analogous to "federal undertakings" under the NHPA."   Sac

26   and Fox Nation of Mo. v. Norton, 240 F.3d 1250, 1263 (10th Cir.
     2001).

1  exploration, sinking the Fourmile Hill test well, and preliminary
2  work on the Fourmile Hill development, mostly associated with the
3  preparation of an EIS.  (AR 21282.)  Calpine's expenses for these
4  activities totaled $2.5 million.  (Id.)  The statute and
5  regulations provide explicitly that bona fide effort is judged
6  against the backdrop of the current market for geothermal
7  resources.  30 U.S.C. § 1005(h); 43 C.F.R. § 3203.1-4(c)(iv).
8  Calpine took serious steps toward development at Fourmile Hill;
9  the drilling of the test well alone cost nearly a half-million
10  dollars.  (AR 21282.)  The BLM's determination that these
11  activities were bona fide efforts was not arbitrary and
12  capricious.

13            V.  Lifting the Five-Year Moratorium

14       Plaintiffs argue that the BLM's lifting of the five-year
15  moratorium on further development in the Highlands violated the
16  Administrative Procedure Act.  (Pls.' Opp'n at 50-51.)
17  Plaintiffs do not specifically identify what procedures the APA
18  requires that were not followed in this case.  The BLM rescinded
19  the moratorium in an agency decision.  (AR 15471-72.)  It based
20  the decision on the new, serious energy shortage, a new executive
21  order directing agencies to expedite projects that increase
22  energy production, and the recommendations of the President's
23  National Energy Policy Development Group for more geothermal
24  power and the streamlining of the geothermal leasing process.
25  (Id.)  There is a rational connection between the energy shortage
26  and administrative policies favoring geothermal power and the

lifting of the development moratorium.  This is all that is required under the "arbitrary and capricious" standard of review under the APA.  Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv., 273 F.3d 1229, 1236 (9th Cir. 2001) ("To determine whether an agency violated the arbitrary and capricious standard, this court must determine whether the agency articulated a rational connection between the facts found and the choice made.").  The BLM's decision to lift the development moratorium because of the nation's energy shortage was not arbitrary and capricious.

VI.  National Forest Management Act Claims

A.  The Klamath Forest Plan Amendment

Plaintiffs argue that the amendment of the Klamath Forest Plan Standard 24-25 violated the National Forest Management Act. The Plan amendment was announced in the 2000 ROD and is governed by the NFMA regulations in effect in 1999.[11]  The applicable regulation states that "the Forest Supervisor shall determine whether a proposed amendment would result in a significant change in the plan."  36 C.F.R. § 219.10(f) (1999).  If the amendment is significant, then the same procedures should be followed as for development and approval of the plan itself.  Id.

---

[11]  The current regulations require only that any amendment be based on the identification and consideration of the relevant issues, applicable information, and an analysis of the proposed amendment's effects.  36 C.F.R. § 219.8.  The previous distinction between significant and non-significant amendments no longer exists, and it appears that even significant plan amendments no longer need to go through any particular procedure.

1    Plaintiffs contend that the amendment to Plan Standard 24-25

2  is significant.  The old Standard provided:  "Protect traditional

3  Native American rights and practices (Public Law (PL) 95-341) to

4  insure the integrity of the site and to assure that the use will

5  continue to occur and will not be impaired."  (FEIS at 4-77.)

6  The new Standard states: "Protect traditional American Indian

7  cultural and religious uses and practices consistent with Public

8  Law 95-341 (American Indian Religious Freedom Act of 1978)."  (AR

9  19984.)  Plaintiffs argue that the new Standard significantly

10  reduces the protection afforded to traditional Indian land uses.

11  Defendants, on the other hand, argue that this was primarily a

12  stylistic change.

13    There is a fair amount of regulatory guidance as to what is

14  "significant," but none of it actually defines the term.  The

15  Forest Service Handbook gives a non-exclusive list of factors to

16  be used to determine significance, which includes timing,

17  location and size of the affected area, relationship to the long-

18  term goals of the Plan, and application to future actions.

19  Forest Service Handbook § 1909.12.5.32(3).  The Forest Service

20  Manual lists four categories of actions that are not significant

21  amendments.  Forest Service Manual § 1922.51.  But these

22  categories reuse the word "significant", or a synonym, in the

23  definitions, making these regulations tautological and therefore

24  unhelpful.[12]

25  _____

26     [12]  For example, the Forest Service Manual lists four
categories of actions that do not significantly affect the
environment.  The first three are: (1) "Actions that do not

1    Whatever the meaning of the term "significant," the Forest

2  Service's determination that a plan amendment is not significant

3  is reviewed under the deferential arbitrary and capricious

4  standard.  Native Ecosystems Council v. Dombeck, 304 F.3d 886,

5  900 (9th Cir. 2002).  Applying this standard, every published

6  opinion reviewing the Forest Service's determination that a plan

7  amendment is not significant has upheld that determination.  See

8  id. at 900 (holding that amendment of Forest Plan to allow a

9  higher road density in a particular area was not significant);

10 Citizens Comm. to Save Our Canyons v. U.S. Forest Serv., 297 F.3d

11 1012, 1034-35 (10th Cir. 2002) (holding that amendment of Forest

12 Plan to allow construction of a building too tall under the old

13 standard was not significant); Wyo. Sawmills, Inc. v. U.S. Forest

14 Serv., 179 F.Supp.2d 1279, 1300-04 (D.Wyo. 2001) (holding that

15 amendment of Forest Plan that was more protective of traditional

16 Indian use of land, at the possible expense of logging interests,

17 was not significant).

18     Here, the Forest Service's determination that the amendment

19 of Standard 24-25 is not a significant change to the Forest Plan

20 is not arbitrary and capricious.  The old and the new Standards

21 have similar language, and both reference the American Indian

22 Religious Freedom Act.  Even assuming that the old Standard was

23

24 significantly alter the multiple-use goals and objectives . . .
25 ;"  (2) "Adjustments of management area boundaries when the
   adjustments do not cause significant changes in the multiple-use
26 goals and objectives . . . ;" (3) "Minor changes in standards and
   guidelines."  Forest Service Manual § 1922.51 (emphasis added).

enforceable and more protective of traditional Indian use of the land, a debatable point, the change is not obviously significant.[13]   The amendment must be viewed against the Plan's "multiple-use goals and objectives."   Insuring continued traditional uses of the land is but one goal of many in the Plan, including wildlife conservation, recreation, and logging.  See Native Ecosystems Council, 314 F.3d at 900 (holding that a Forest Plan amendment was not significant because it did "not alter multiple-use goals or objectives for long-term land and resource management").  Under the regulations, the Forest Supervisor must determine whether the amendment is a significant amendment of the Plan, not just a significant amendment of any one of the Plan's provisions.  Given that the new Standard continues to protect traditional Indian land uses, and that all of the myriad other land use "goals and objectives" remain unchanged, the Forest Service's determination that the amendment is not significant is

---

[13]   The plaintiffs argue that the amendment is significant because the Fourmile Hill project was inconsistent with the old Standard and so could not have occurred without the amendment. (Pls.' Opp'n at 44.)   There is language in the FEIS that indicates that the Forest Service believed that there was a "potential inconsistency" between the new Standard and the language, though not "the intent," of the old Standard.   (FEIS at 4-78.)   This potential inconsistency arose from the Forest Service's interpretation of the phrase "assure that the use will continue to occur and will not be impaired" to mean that the Forest Service must insure that the Indian community will continue the religious use of an area.   (Id.)   The Forest Service's opinion was that this was an unenforceable policy because the agency could not require American Indians to continue to use an area in any particular way.   The old Standard, interpreted in this fashion, would be unenforceable.   The plan amendment was intended to correct this supposed problem while maintaining a level of protection consistent with the American Indian Religious Freedom Act.

1  not arbitrary and capricious.

2      B.  Project Approval

3      Plaintiffs allege that approval of the Fourmile Hill project

4  violated the NFMA because the project is inconsistent with the

5  Klamath and Modoc Forest Plans.[14]  (Compl. ¶ 124.)   The

6  plaintiffs argue that Fourmile Hill is inconsistent with the

7  Modoc Plan Standard 2-5, which provides that the Plan will

8  "[p]rotect access and use of sites and locations important to

9  traditional Native American religious and cultural practices

10  consistent with" the American Indian Religious Freedom Act

11  ("AIRFA").  (Pls.' Opp'n Ex. G.)

12     Whether the Fourmile Hill project is consistent with Modoc

13  Forest Plan Standard 2-5 depends on what that Standard means.

14  Unfortunately, the Standard is ambiguous.  It states that access

15  and use will be protected consistent with AIRFA, so that AIRFA

16  determines the scope of the Plan's protections.  AIRFA states

17  that "it shall be the policy of the United States to protect and

18  preserve for American Indians their inherent right of freedom to

19  believe, express, and exercise the traditional religions of the

20

21      [14]  Plaintiffs' allegations and briefs concentrate on the
    failure of the FEIS and ROD to "address" all the relevant
22  standards in the two Forest Plans.  (Pls.' Opp'n at 45-47.)
    However, plaintiffs seem to be basing this claim on 16 U.S.C. §
23  1604(i), which requires that actions be consistent with Forest
    Plans.  See Friends of Southeast's Future, 153 F.3d at 1070.  A
24  violation of § 1604(i) is not a failure to discuss possible
    inconsistency, but the inconsistency itself.  Plaintiffs'
25  arguments about a failure to *discuss* consistency with certain
    standards are irrelevant; the relevant question is whether the
26  Fourmile Hill project *is* consistent with the Modoc and Klamath
    Forest Plans.

American Indian . . ., including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." 42 U.S.C. § 1996. None of the statutory language is directed to other land uses that may detract from religious observance while not preventing access to sites or preventing worship. Moreover, the general language about a "policy" of the United States has led courts to hold that AIRFA "requires federal agencies to consider, but not necessarily defer to, Indian religious values. It does not prohibit agencies from adopting all land uses that conflict with traditional Indian religious beliefs." Wilson v. Block, 708 F.2d 735, 747 (D.C. Cir. 1983). The Ninth Circuit has held that AIRFA "does no more than direct federal officials to familiarize themselves with Native American religious values." Standing Deer v. Carlson, 831 F.2d 1525, 1530 (9th Cir. 1987).

The Forest Service's determination that the Fourmile Hill project is consistent with the Forest Plan provision cannot be deemed arbitrary and capricious. The Forest Service had before it a thorough evaluation of the tribes' spiritual interest in the Highlands and the possible effects of the power plant on the tribes' religious practices. Development at Fourmile Hill does not prevent access to important religious and cultural sites within the Highlands.[15] (FEIS at 4-336.) It does not affect the

---

[15] After the amendment previously discussed, the Klamath Forest Plan Standard 24-25 is almost identical to Standard 2-5 of the Modoc Plan. All of the above arguments about the Modoc Plan apply with equal force to the Klamath Plan.

1  local Indians' freedom of belief or prevent them from continuing
2  traditional religious practices if they so choose.  The agencies
3  considered Indian religious values in their decision and the
4  Forest Plan does not clearly require more.

## VII.  Indian Trust Obligations

Plaintiffs assert a claim based on the federal defendants'
violation of their fiduciary obligations to the Tribe.  They
argue that the claim arises out of the federal defendants'
issuance of the leases, extension of the leases, and approval of
the Fourmile Hill project. (Pls.' Mot. at 17-21; Pls.' Opp'n at
47-48.)  The plaintiffs emphasize the spiritual importance of the
Highlands and the Tribe's assertion of jurisdiction over the
Highlands in its constitution.  That the Tribe asserts
jurisdiction over the Highlands is an internal tribal matter and
does not turn the Highlands into tribal land.  See Felix Cohen,
Handbook of Federal Indian Law 143 (1942 ed.) (noting that Indian
tribes can exercise jurisdiction over tribal property and any
individual property of tribe members even off tribal land).  That
the land is spiritually important to the Tribe also does not
change the federal government's ownership of the land.  See id.
at 289 (distinguishing between tribal land and federal public
land).

Though the Highlands are not Tribal land, plaintiffs argue
that the Tribe's constitution is akin to a treaty and creates
fiduciary duties for the federal government in its management of

the Highlands.  (Pls.' Reply at 6.) The federal government does owe a high fiduciary duty to a tribe when its actions involve tribal property or treaty rights.  See, e.g., <u>Pyramid Lake Paiute Tribe v. U.S. Dep't of the Navy</u>, 898 F.2d 1410, 1420 (9th Cir. 1990) (holding the federal government has a fiduciary duty to preserve and protect the Pyramid Lake fishery which is located on the reservation).  However, the Pit River Tribe's constitution is not similar to a treaty – a binding obligation entered into between two sovereigns.  Its constitution is a document for the Tribe's internal governance, and approval by the Secretary of the Interior does not transform it into a treaty.  Although there may be a general fiduciary duty of the federal government owed to Indians, "unless there is a specific duty that has been placed on the government with respect to Indians, this responsibility is discharged by the agency's compliance with general regulations and statutes not specifically aimed at protecting Indians." <u>Morongo Band of Mission Indians v. FAA</u>, 161 F.3d 569, 574 (9th Cir. 1998).

The plaintiffs attempt to distinguish <u>Morongo Band</u> because that case dealt with general reservation land and not an area held sacred for centuries like the Highlands.  (Pls.' Reply at 8.)  Plaintiffs cite a host of federal statutes, regulations, and executive orders demonstrating the federal government's recognition of the importance of tribal religion and spirituality, such as AIRFA, the Religious Freedom Restoration Act, Executive Order 13007, and provisions of the BLM manual.

However, the existence of these provisions does not distinguish this case from <u>Morongo Band</u>.  If these statutes and executive directives impose specific duties on the federal government towards Indians, then the federal government must obey the statutes and directives.  But plaintiffs do not argue that these statutes and directives were actually violated, only that they demonstrate the importance of tribal spirituality.  Under <u>Morongo Band</u>, the government's recognition of the central place of tribal religion and spirituality does not create new trust obligations and duties.[16]

Because this case does not involve tribal property, the federal agencies' duty to the Tribe is to follow all applicable statutes.  As discussed earlier, the agencies did not violate any statutes during the approval process for Fourmile Hill; therefore, the federal government satisfied its fiduciary duty to the local tribes.[17]

---

[16]   Plaintiffs also rely on the decision in <u>Northern Cheyenne Tribe v. Hodel</u>, 804 F.Supp. 1281 (D.Mont. 1991).  However, <u>Northern Cheyenne Tribe</u> involved coal leases on federal land near the tribe's reservation.  <u>N. Cheyenne Tribe</u>, 804 F.Supp. at 1283.  <u>Northern Cheyenne Tribe</u> is like the Ninth Circuit's decisions recognizing that the federal government owes the Paiute Tribe a fiduciary duty when making decisions about upstream water use in Nevada that affect the size of Pyramid Lake, a tribal lake.  <u>See, e.g.</u>, <u>Pyramid Lake Paiute Tribe</u>, 898 F.2d at 1420.  The key fact in these cases is that the impacts occur on the reservation, which the federal government has a special duty to protect.  However, the Fourmile Hill project does not directly affect life on the Pit River reservation.

[17]   The plaintiffs argue that the failure to meet with the local tribes prior to the development stage violated the government's fiduciary obligations.  However, the earlier decisions only allowed casual use and light exploration, which

VIII.   Failure to Timely Implement the Record of Decision

Plaintiffs assert that the federal defendants have violated the Administrative Procedure Act by failing to implement the Record of Decision in a timely fashion, namely by failing to develop a Historic Properties Management Program for the Highlands.  (Compl. ¶ 129.)  The Forest Service and the BLM committed to develop a Historic Properties Management Program in a Memorandum of Agreement, which was incorporated into the ROD issued for the approval of the Fourmile Hill project.  (AR 20006, 20051.)  Plaintiffs allege that the agencies have failed "to initiate and diligently pursue development of" the required Historic Properties Management Program, which amounts to an abuse of its discretion under the APA.  (Compl. ¶ 130.)

The federal defendants argue that the court lacks jurisdiction to hear this claim under the APA, because there has been no final agency action.  (Fed. Defs.' Opp'n at 50.)  They argue that jurisdiction is inappropriate under 5 U.S.C. § 706(1), which grants jurisdiction to "compel agency action unlawfully withheld or unreasonably delayed," because there is no "clear statutory duty" to act.  Mont. Wilderness Ass'n, Inc. v. U.S. Forest Serv., 314 F.3d 1146, 1150 (9th Cir. 2003).  Plaintiffs argue that the agencies created a duty to act by adopting certain

_____

the government could reasonably conclude would have no significant effect on the tribes.  When the agencies considered development, an action that might have significant effects on the tribes, they engaged the local tribes in significant consultations.  See supra section I.D.

conditions as part of the ROD.  However, there is no authority

holding that a condition in a ROD or similar document can create

the agency's duty to act for purposes of APA review.  In the

absence of any such precedent, the court declines to expand APA

review of agency inaction in this context.

Moreover, and alternatively, even if the ROD creates a duty

enforceable under the APA, the record in this case does not

reveal any unreasonable agency inaction.  The agencies have

produced evidence showing substantial progress toward completion

of the Historic Properties Management Program.  A planning team

has been assembled, and a Team Leader has been hired.  (Gowan

Decl. ¶¶ 3-4.)  Meetings have been held with the agencies and the

Klamath and Pit River Tribes.  (Id. ¶ 4.)  The major part of a

draft report has been completed, and a portion shared with the

Tribes.  (Id. ¶¶ 5-6.)  According to the agencies' expert, the

development of the Historic Properties Management Program is a

complex task; it is therefore impossible to consider the progress

to date an arbitrary and capricious failure to implement the

terms of the ROD.

IX.  Conclusion

The federal agencies properly observed all of the procedural

requirements during the various stages of approving the Fourmile

Hill development project, including preparation of an extensive

Environmental Impact Statement.  The court's role is to review

compliance with these procedures, not to review the substance of

1   the agencies' decision.   Therefore, defendants' motion for

2   summary judgment is GRANTED, and plaintiffs' motion is DENIED.

3

4        IT IS SO ORDERED.

5   Dated: *13 February 2004* .

6

7                                    David F. Levi

8                              DAVID F. LEVI
                               United States District Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

United States District Court
for the
Eastern District of California
February 17, 2004


* * CERTIFICATE OF SERVICE * *


2:02-cv-01314


Pit River Tribe

    v.

US Dept of Interior


_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  February 17, 2004, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.


        Deborah Ann Sivas                        HV/DFL
        Earthjustice Legal Defense Fund
        Owen House                               CF/JFM
        553 Salvatierra Walk
        Stanford, CA  94305-8620

        Edmund F Brennan
        United States Attorney
        501 I Street
        Suite 10-100
        Sacramento, CA  95814

        Jeffery Donald Harris
        Ellison Schneider and Harris
        2015 H Street
        Sacramento, CA  95814

        Robert A Maynard
        Perkins Coie LLP
        251 East Front Street
        Suite 400
        Boise, ID  83702

        Richard W Oehler
        Perkins Coie LLP
        1201 Third Avenue

Jack L. Wagner, Clerk

BY: _____
Deputy Clerk